# ORIGINAL

CLERK, U.S. DISTRICT COURT
FILED
MAR 1 2013
By_____
Deputy

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| MARK AMASON, | § | |
| PLAINTIFF, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:11-CV-805-A |
| | § | |
| CAROLYN W. COLVIN, | § | |
| ACTING COMMISSIONER | § | |
| OF SOCIAL SECURITY, | § | |
| DEFENDANT. | § | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE
## AND
## NOTICE AND ORDER

This case was referred to the United States Magistrate Judge pursuant to the provisions of Title 28, United States Code, Section 636(b). The Findings, Conclusions, and Recommendation of the United States Magistrate Judge are as follows:

### FINDINGS AND CONCLUSIONS

### I. STATEMENT OF THE CASE

Plaintiff Mark Amason ("Amason") filed this action pursuant to Sections 405(g) and 1383(c)(3) of Title 42 of the United States Code for judicial review of a final decision of the Commissioner of Social Security denying his claims for disability insurance benefits ("DIB") under Title II and supplemental security income ("SSI") under Title XVI of the Social Security Act ("SSA"). Amason applied for DIB on March 8, 2010, and SSI on March 11, 2010, alleging that his disability began on April 1, 2001. (Tr. 132–37.) At the hearing, Amason amended his alleged onset date of disability to March 5, 2010, thus becoming ineligible for DIB benefits. (Tr. 149.)

After his application for benefits was denied initially and on reconsideration, Amason requested a hearing before an administrative law judge ("ALJ"). (Tr. 69–72, 96–97.) The ALJ

held a hearing on June 1, 2011, and issued an unfavorable decision on July 19, 2011. (Tr. 7–26.) On November 15, 2011, the Appeals Council denied Amason's request for review, leaving the ALJ's decision as the final decision of the Commissioner in his case. (Tr. 1–4.) Amason subsequently filed this civil action seeking review of the ALJ's decision.

## II. STANDARD OF REVIEW

SSI benefits are governed by Title XVI, 42 U.S.C. § 1381 *et seq.*, of the SSA. In addition, numerous regulatory provisions govern SSI benefits. *See* 20 C.F.R. Pt. 416 (2012). The SSA defines a "disability" as a "medically determinable physical or mental impairment" lasting at least twelve months that prevents the claimant from engaging in "any substantial gainful activity." 42 U.S.C. §§ 423(d), 1382c(a)(3)(A); *see McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). To determine whether a claimant is disabled, and thus entitled to benefits, a five-step analysis is employed. 20 C.F.R. § 416.920(a)(4). First, the claimant must not be presently working at any substantial gainful activity. *Id.* § 416.920(b). "Substantial gainful activity" is defined as work activity "that involves doing significant physical or mental activities . . . for pay or profit." *Id.* § 416.972. Second, the claimant must have an impairment or combination of impairments that is severe. *Id.* § 461.920(c); *see also Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000). Third, disability will be found if the impairment or combination of impairments meets or equals an impairment contained in the Listing of Impairments ("Listing"), 20 C.F.R. Pt. 404, Subpt. P, App. 1. 20 C.F.R. § 416.920(d). Fourth, if disability cannot be found on the basis of the claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* § 416.920(f). And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age,

education, and past work experience. *Id.* § 416.920(g); *Crowley v. Apfel*, 197 F.3d 194, 197–98 (5th Cir. 1999).

Before moving from the third to the fourth step of the inquiry, the Commissioner assesses the claimant's residual functional capacity ("RFC") to determine the most the claimant can still do notwithstanding his physical and mental limitations. 20 C.F.R. § 416.920(a)(4). The claimant's RFC is used at both the fourth and fifth steps of the sequential analysis. *Id.* § 416.920(a)(4). At step four, the claimant's RFC is used to determine if the claimant can still do his past relevant work. *Id.* § 416.920(e). At step five, the claimant's RFC is used to determine whether the claimant can adjust to other types of work. *Id.* At steps one through four, the burden of proof rests upon the claimant to show that he is disabled. *Crowley*, 197 F.3d at 198. If the claimant satisfies this responsibility, the burden shifts to the Commissioner to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Id.*

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.* A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* This Court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if the evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000); *Hollis*, 837 F.2d at 1383.

## III.  ISSUES

Amason presents the following issues:

1. The ALJ's RFC determination was not based on substantial evidence and contained errors of law;

2. The ALJ's decision was not based on substantial evidence and contained errors of law because of an incomplete hypothetical posed to the vocational expert, inaccurate vocational expert testimony, and a failure to address erosion of the occupational base;

3. The ALJ improperly evaluated Amason's obesity; and

4. The ALJ's assessment of Amason's credibility contained errors of law and was not based on substantial evidence.

(Pl.'s Br. 1.)

## IV.  ALJ DECISION

In his July 19, 2011 decision, the ALJ concluded that Amason was not disabled within the meaning of the SSA.  (Tr. 21.)  In making his determination, the ALJ proceeded to follow the five-step sequential evaluation process.  At the first step, the ALJ found that Amason had not engaged in any substantial gainful activity since March 5, 2010—the amended alleged onset date of disability.  (Tr. 12.)  At the second step, the ALJ found that Amason suffered from the following severe impairments: (1) bipolar II disorder, (2) anxiety disorder, (3) alcohol dependence in early remission, (4) obesity, (5) degenerative disc disease, (6) lumbar stenosis, (7) bilateral carpal tunnel syndrome, and (8) degenerative joint disease of the bilateral knees.  At the third step, the ALJ found that Amason's severe impairments did not meet or equal in severity to an impairment contained in the Listing.  (Tr. 13.)

The ALJ then found that Amason had the RFC to perform light work, with the following limitations: (1) detailed, but not complex work; (2) alternating sitting and standing to alleviate pain or discomfort; (3) no climbing of ladders, ropes, or scaffolds; (4) occasional climbing, balancing, stooping, kneeling, crouching, and crawling; (5) occasional handling, fingering, and

feeling bilaterally; and (6) frequent reaching and reaching overhead bilaterally. (Tr. 14.) Next, at the fourth step, the ALJ found that Amason was unable to perform any past relevant work. (Tr. 19.) Finally, at the fifth step, the ALJ determined that, based on Amason's RFC and on his age, education, and work experience, there were jobs existing in significant numbers in the national economy that Amason could perform. Thus, Amason was not disabled and had not been disabled at any time through the date of the decision. (Tr. 20.)

## V.   DISCUSSION

### A.   Issue One: Was the ALJ's RFC Determination Based on Substantial Evidence, and Did It Contain Errors of Law?

#### 1.  Physical Impairments

In his first issue, Amason argues that the ALJ's RFC assessment was not based on substantial evidence because it was based on unreliable orthopedic exam findings made by consultative examiner Ade Adedokun, D.O. ("Dr. Adedokun"). (Pl.'s Br. 14.) Amason further argues that the ALJ's RFC assessment was inconsistent with the limitations imposed by his impairments. (Pl.'s Br. 15.)

#### a.  Consultative Orthopedic Exam

In his decision, the ALJ reviewed consultative examiner Dr. Adedokun's orthopedic exam findings, dated April 24, 2011. (Tr. 579–88.) Dr. Adedokun noted pain of the hip joints, knee joints, back, and limbs, as well as arthralgias and joint pain. (Tr. 586.) At the exam, Amason was unable to hop, squat, or walk on his tiptoes or heels, but he was able to do the tandem gait and was able to ambulate without an assistive device. (Tr. 587.) Amason's gait was normal, and he had normal movements of all extremities and normal muscle strength and tone. (Tr. 588.) Neurological testing showed normal deep tendon reflexes and 5/5 muscle strength throughout. (Tr. 588.) Amason had bilateral hand numbness with decreased sensation. (Tr.

588.) He had good cervical range of motion, but he refused lumbar range of motion measurements due to his back pain. (Tr. 588.) An x-ray of the lumbosacral spine was performed, and Dr. Adedokun noted that it showed spondylosis of the lumbar spine. (Tr. 588.)

Dr. Adedokun completed a medical source statement in which he opined that Amason could not lift and carry over fifty pounds but could frequently lift and carry up to ten pounds and occasionally lift up to fifty pounds. (Tr. 579.) Amason could sit up to eight hours and stand and walk up to six hours in an eight-hour work day. (Tr. 580.) He could frequently reach and reach overhead, and he could occasionally handle, finger, feel, and push/pull with his hands. (Tr. 581.) He could occasionally climb, balance, stoop, kneel, crouch, and crawl. (Tr. 582.) He could also occasionally tolerate exposure to environmental conditions such as unprotected heights, moving mechanical parts, dust, extreme temperatures, and so forth. (Tr. 583.)

### b. Consultative Internal Medicine Exam

The ALJ also discussed exam findings reported by consultative internal medicine examiner Bonnie Lammers, M.D. ("Dr. Lammers") on June 23, 2010, in which Dr. Lammers evaluated Amason's neck, back, knee, and ankle complaints and concluded that, "[o]bjectively, this is a normal physical exam." (Tr. 414–15.) Dr. Lammers reviewed cervical, thoracic, and lumbar spine x-rays performed in April 2009. (Tr. 412.) She noted that (1) the cervical x-rays showed osteophytes at C5, C6, and C6-C7; (2) the thoracic x-rays showed mild rotoscoliosis and some osteoarthritic changes; and (3) the lumbar x-rays showed a marginal spur suggesting osteoarthritic changes. (Tr. 412.) Dr. Lammers also reported that x-rays of the knees and left ankle performed in October 2009 documented normal knees, and the left ankle showed mild bimalleolar soft tissue swelling but no significant bony abnormalities. (Tr. 412.) Exam of the back, neck, and extremities was normal. (Tr. 414.) Dr. Lammers' exam findings showed that Amason's neck and back were nontender, with no muscle spasms. (Tr. 414.) He was able to use

his hands and fingers without difficulty and had full range of motion in the neck, shoulders, and lumbar spine. (Tr. 414.) Amason moved easily and was able to get on and off the examination table with ease. (Tr. 414.) He was able to toe, heel, and tandem walk, and he was able to squat and raise himself back up again. (Tr. 414.) Reflex, muscle strength, sensory exam, and straight leg raise testing were normal. (Tr. 414.) Dr. Lammers' clinical impression was that her exam of Amason's neck, back, knees, and ankles was "normal." (Tr. 414–15.)

### c. Treating Doctor Exam Records

The ALJ also reviewed medical records of treating physician Sebastian Ksionski, M.D. ("Dr. Ksionski"). (Tr. 447–54, 527–32.) Amason first saw Dr. Ksionski on June 21, 2010, for treatment of his low back pain. (Tr. 452.) Amason's gait was normal, and he was able to forward flex, extend, and lateral bend within normal limits. (Tr. 453.) Axial bending reproduced pain in the low back. (Tr. 453.) Ober testing was positive bilaterally. (Tr. 453.) An MRI showed (1) mild degenerative disk disease at T12-L1 with no spinal canal or neural foraminal canal stenosis; (2) multifactorial spinal canal stenosis at L3-L4 with mild impingent upon the neural foraminal canal; (3) focal disk protrusion and moderate bilateral facet arthropathy with mild ligamentum flavum hypertrophy at L4-L5; and (4) mild broad-based disk protrusion at L5-S1, but no effacement upon the thecal sac and no nerve root impingement. (Tr. 453.) Dr. Ksionski assessed Amason with lumbar scoliosis/facet arthropathy, lumbago, and bilateral iliotibial band syndrome. (Tr. 453.) Dr. Ksionski recommended bilateral L3-L4 and L4-L5 facet injections as well as stretching exercises. (Tr. 453.)

On December 23, 2010, Amason again saw Dr. Ksionski, complaining that the lumbar injections had helped initially but the pain had become worse. (Tr. 529.) The ALJ discussed Dr. Ksionski's exam findings of tenderness to palpitation along the paraspinal facets and the cervical, thoracic, and lumbar spine. (Tr. 16, 529.) Axial column loading was positive

bilaterally, and there was some slight decreased sensation in the dorsal aspect of his feet. (Tr. 16, 529.) Muscle testing was 5/5, and deep tendon reflexes were 2+ in both the upper and lower extremities. (Tr. 529.) Dr. Ksionski's impressions were cervical spondylosis, lumbar spondylosis, and peripheral neuropathy. (Tr. 16, 529.) Also mentioned in Dr. Ksionski's report was that an October 2010 MRI showed cervical, thoracic, and lumbar spondylosis and that electromyography ("EMG") findings showed a diagnosis of peripheral neuropthy. (Tr. 529.)

### d. ALJ Findings and Analysis Regarding Physical Impairments

After reviewing the above medical evidence, the ALJ concluded that, despite MRI and x-ray evidence of degenerative disc disease with mild spinal canal stenosis at L3-4, examinations had been "relatively benign." (Tr. 17.) The ALJ noted that Dr. Lammers' consultative exam findings were normal, and Dr. Ksionski observed normal gait and full lumbar range of motion, although axial bending reproduced some low back pain. (Tr. 17.) The ALJ also noted that Amason refused lumbar range of motion testing with consultative examiner Dr. Adedokun. (Tr. 17.) With regard to Amason's knees, the ALJ observed that x-rays were normal, and exams by Dr. Lammers and Dr. Adedokun also were normal. (Tr. 17.) Although Dr. Ksionski observed bilateral positive Ober testing, he recommended only that Amason do stretching exercises. (Tr. 17.)

The ALJ stated that Amason attended only "relatively infrequent appointments for his allegedly disabling pain" and was being treated only with pain medication at the time of the hearing. (Tr. 17.) The ALJ stated that Amason brought a cane to the hearing, but Amason did not testify that he required the cane for ambulation, and the record did not contain a prescription for a cane or document any observed cane usage. (Tr. 18.) The ALJ gave "significant weight" to Dr. Adedokun's opinion regarding Amason's functional abilities because the opinion was

consistent with Dr. Adedokun's own objective findings and with the other medical evidence in the record. (Tr. 19.)

The ALJ also acknowledged that EMG testing showed generalized peripheral neuropathy and bilateral carpal tunnel syndrome, that examinations revealed decreased sensation in Amason's hands, and that Amason testified that he had difficulty grasping and using zippers and buttons. (Tr. 18, 558.) However, the ALJ stated that Dr. Lammers had observed that Amason had full grip strength.[1] (Tr. 18.)

Amason challenges the ALJ's reliance on Dr. Adedokun's opinion because Amason claims that the opinion was based on a single lumbar x-ray, but other medical records—lumbar MRIs, cervical, thoracic, and lumbar x-rays, and EMG testing—"demanded a more restrictive RFC." (Pl.'s Br. 14.) However, the mere diagnosis of an impairment does not establish a disabling impairment or even a significant impact on a claimant's RFC. *See Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983). The ALJ reviewed the records of Amason's treating doctor, Dr. Ksionski, which included references to MRIs of Amason's spine as well as the EMG findings. However, Dr. Ksionski still observed that Amason's gait was normal and that Amason was able to forward flex, extend, and lateral bend within normal limits. Furthermore, Dr. Ksionski's musculoskeletal assessment showed normal muscle strength and normal deep tendon reflexes in the upper and lower extremities. Further corroborating Dr. Adedokun's opinion was Dr. Lummers' conclusion that Amason's back and neck exam was normal, and Dr. Lummers observed no limitation in Amason's ability to use his hands and fingers. Accordingly, in the absence of evidence of any further functional limitations attributable to the conditions shown on the additional MRIs, x-rays, and EMG testing, the Court cannot conclude that these medical

---

[1] Presumably, this is based on Dr. Lammers' observation that Amason was "able to use his hands and fingers without difficulty." (Tr. 414.)

records "demanded" a more restrictive RFC finding or caused Dr. Adedokun's opinion to be insufficiently supported.

Amason also argues that Dr. Adedokun's opinion that he could stand and walk for six hours of an eight-hour workday, and that he could occasionally squat, was inconsistent with Dr. Adedokun's physical exam in which Amason was unable to hop, squat, or walk on his tiptoes or heels and was unable to complete lumbar range of motion testing because of pain.[2] However, Dr. Adedokun also observed that Amason was able to do the tandem gait and was able to ambulate without an assistive device. In addition, Dr. Adedokun observed that Amason's gait, reflexes, muscle strength, and movements of extremities were all normal.

Finally, Amason complains that Dr. Adedokun's physical exam did not include any customary orthopedic testing, such as a straight leg raise. (Pl.'s Br. 12, 14–15.) While Dr. Adedokun's exam did not report straight leg raise findings, Dr. Lammers' exam did include straight leg raise testing, and the results were normal. Accordingly, viewing the medical evidence as a whole, the Court concludes that substantial evidence supports the ALJ's decision to give Dr. Adedokun's opinion significant weight because it was consistent with Dr. Adedokun's own findings and with the other medical evidence in the record.

Amason also complains that other medical evidence in the record showing spinal stenosis, ruptured lumbar discs, and chronic low back and knee pain, as well as his own subjective complaints of inability to stand and walk for more than a short amount of time, undermine the ALJ's RFC assessment. (Pl.'s Br. 15.) The ALJ recognized Amason's subjective complaints but also recognized that he attended only "relatively infrequent" doctor's appointments for his allegedly disabling pain, was being treated only with pain medication, and

---

[2] Dr. Adedokun's opinion did not specifically state that Amason could occasionally squat. More accurately, Dr. Adedokun opined that Amason could occasionally climb stairs and ramps, climb ladders or scaffolds, balance, stoop, kneel, crouch, and crawl. (Tr. 582.)

was able to walk without a cane or other assistance. While Amason may disagree with the ALJ's rationale, the ALJ retains the sole responsibility for determining an individual's RFC based on all of the relevant evidence. *See Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995); 20 C.F.R. § 416.946(c); SSR 96–8p, 61 Fed. Reg. 34474, 34477 (July 2, 1996). This Court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's, but may determine only whether substantial evidence is present. *See Harris*, 209 F.3d at 417; *Hollis*, 837 F.2d at 1383. Accordingly, having carefully reviewed the record and the ALJ's discussion of the evidence, the Court concludes that the ALJ's RFC assessment is supported by credible evidentiary choices among the medical evidence in the record and demonstrates the existence of substantial evidence supporting the ALJ's decision. *See Boyd*, 239 F.3d at 704.

Next, Amason argues that the ALJ's RFC finding is erroneous because it does not contain the required function-by-function assessment of his ability to perform work-related activities. (Pl.'s Br. 13.) Social Security Ruling ("SSR") 96–8p requires a function-by-function analysis of how a severe impairment affects a claimant's RFC as follows: "The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR [§§] 404.1545 and 416.945." SSR 96–8p, 61 Fed. Reg. at 34475. Paragraph (b) of 20 C.F.R. § 416.945, which explains how physical abilities are to be evaluated in relation to a claimant's RFC in SSI benefit cases, includes the following functions: "physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching)." 20 C.F.R. § 416.945(b). Amason complains that the ALJ's RFC finding states that he is capable of performing "light work" without making the specific functional findings required by SSR 96–8p.

The Court disagrees because a reading of the ALJ's entire decision makes clear that he properly considered Amason's ability to perform the work-related functions listed in the regulations. As discussed above, the ALJ thoroughly reviewed the medical evidence relating to Amason's physical impairments, including a narrative discussion of the medical signs, symptoms, and findings and explaining how the ALJ considered them in formulating Amason's RFC. The ALJ stated that he had given great weight to Dr. Adedokun's opinion regarding Amason's RFC, which included Dr. Adedokun's analysis of Amason's abilities in the required physical exertional areas. (Tr. 19, 579–82.) Because substantial evidence supports the ALJ's physical RFC determination, remand is not required.[3]

## 2. Mental Impairments

In his decision, the ALJ reviewed evidence relating to Amason's bipolar disorder and anxiety disorder and concluded that these mental impairments were "severe but not disabling." (Tr. 18.) Amason complains that the ALJ erroneously disregarded a one-page Medical Release/Physician's Statement, completed on February 22, 2010, by MHMR physician N. Allison, D.O. ("Dr. Allison"). (Pl's Br. 15.) In this statement, Dr. Allison opined that Amason was unable to work and that he was even unable to participate in activities to prepare for work. (Tr. 356.) When evaluating evidence of a claimant's impairments, an ALJ generally gives controlling weight to a well-supported medical opinion provided by a treating physician. *See* 20 C.F.R. § 416.927(c)(2). However, a physician's statement that a claimant is "disabled" or "unable to work" is not a medical opinion but instead is an opinion on an issue reserved to the Commissioner. *Id.* § 416.927(d). A statement by a medical source that a claimant is "disabled"

---

[3] Even if the Court were to assume that the ALJ did not properly perform the function-by-function analysis required by SSR 96–8p, remand would still not be required because there is no indication that the ALJ's determination would have changed had he done so, and substantial evidence supports the ALJ's RFC determination. *See Pearson v. Barnhart*, No. 1:04-CV-300, 2005 WL 1397049, at *4 (E.D. Tex. May 23, 2005) (citing *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000) (stating that a violation of a Social Security ruling may "constitute error warranting reversal and remand when an aggrieved claimant shows prejudice resulting from the violation").

or "unable to work" does not mean that the Commissioner will find that the claimant is disabled for purposes of SSI benefits. *Id.* §416.927(d)(1). In fact, the Commissioner does not give any special significance to a physician's opinion on whether a claimant is disabled because that is an ultimate issue to be determined by the Commissioner. *Id.* § 416.927(d)(3).

The Commissioner is responsible for making the decision about whether a claimant meets the statutory definition of disability, based upon a review of all of the medical findings and other evidence that support the physician's statement of disability. *See id.* §416.927(d)(1). The Medical Release/Physician's Statement contained only Dr. Allison's opinion that Amason was unable to work, and it was not accompanied by any medical findings or other evidence. Amason complains that the ALJ failed to give any weight to Dr. Allison's opinion, but as explained above, the ALJ was not required to give any special significance to Dr. Allison's opinion at all. *See id.* § 416.927(d).

The ALJ's decision notes that findings from a June 11, 2010 consultative exam with Deborah Cole, Ph.D. ("Dr. Cole") revealed normal thought process, thought content, and appearance, behavior, and speech. (Tr. 424.) Amason did not exhibit signs of perceptual distortions, but he admitted to hearing voices and seeing someone in his peripheral vision at times. (Tr. 424.) His mood was depressed, with normal range of affect, and he reported periods of manic behavior. (Tr. 424.) Dr. Cole diagnosed Amason with (1) bipolar disorder, most recent episode, depressed, moderate; (2) polysubstance dependence, in remission; (3) adverse effects from medication, not otherwise specified; and (4) antisocial personality disorder. (Tr. 424.) Dr. Cole assessed a GAF score of 50[4] and stated that if Amason received management of his

---

[4] The Global Assessment of Functioning (GAF) scale rates psychological, social, and occupational functioning on a scale of 0 to 100. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. text rev. 2000) [hereinafter "*DSM-IV-TR*"]. A GAF score of 41–50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.*

medication and participated in group therapy to help him address his social conflicts and antisocial behaviors, his prognosis was good. (Tr. 426.)

Amason argues that the ALJ's limitation to detailed, but not complex work did not reflect the severity of his mental impairments as shown in his MHMR records from 2006 to 2011, which consistently indicated serious symptoms and assessed GAF scores of 50 or below. (Pl.'s Br. 15.) The ALJ observed in his decision that MHMR mental status examination notes show repeated observations of guarded attitude and irritable mood, but no abnormalities in appearance, motor activity, affect, speech, thought process, thought content, or cognitive abilities. (Tr. 18, 338, 493, 488, 542.)

Amason apparently had received MHMR services in 2007, but records show a lapse in treatment until late 2009. (Tr. 359, 503.) When Amason resumed consistent treatment at MHMR in March 2010, he was assessed with a GAF score of 44. (Tr. 339.) The ALJ noted this score, but he also observed that on May 26, 2010, after only two months of treatment, Amason's GAF score was raised to 50.[5] (Tr. 18, 494.) Contrary to Amason's contention, the ALJ did not dismiss the low GAF score of 44, but he viewed it in light of the other evidence in the record and recognized that a GAF score is not determinative of a claimant's ability to work. (Tr. 18.) *See* 65 Fed. Reg. 50746, 50764–65 (Aug. 21, 2000) (declining to endorse the GAF scale for use in Social Security and SSI disability programs and stating that the GAF scale "does not have a direct correlation to the severity requirements in our mental disorders listings"); *see also, e.g.,* *Kennedy v. Astrue*, 247 F. App'x 761, 766 (6th Cir. 2007); *Wind v. Barnhart*, 133 F. App'x 684, 692 n.5 (11th Cir. 2005); *Andrade v. Astrue*, No. 4:11-CV-318-Y, 2012 WL 1106864, at *8 (N.D. Tex. Feb. 13, 2012), *adopted in* 2012 WL 1109476 (N.D. Tex. Apr. 2, 2012).

---

[5] Several months later, on August 19, 2010, his GAF score was raised to 55. (Tr. 489.) Amason received a GAF score of 55 again on December 9, 2010, and a GAF score of 50 on January 7, 2011, and March 10, 2011. (Tr. 540, 543, 545.)

14

The ALJ observed that, although Amason alleged an inability to concentrate and difficulty retaining information, MHMR staff did not observe any deficits in these areas, and Dr. Cole observed normal thought process and relatively intact memory and concentration. (Tr. 18.) Also, the ALJ considered a State agency consultant's July 26, 2010 opinion stating that Amason could (1) understand, remember, and carry out detailed but not complex instructions; (2) make decisions, attend, and concentrate for extended periods; (3) interact adequately with coworkers and supervisors; and (4) respond appropriately to changes in routine work settings. (Tr. 431.) The ALJ observed that even though Amason reported improvement with medication, he was noncompliant with his medication on several occasions. (Tr. 18, 490, 540, 545.) Nevertheless, the ALJ stated that he had given Amason "the benefit of every doubt" with respect to his complaints of impaired concentration and thinking and, therefore, had included a limitation to "detailed, but not complex work" in his RFC. (Tr. 19.)

Again, the ALJ retains the sole responsibility for determining an individual's RFC based on all of the relevant evidence. *See Ripley*, 67 F.3d at 557; 20 C.F.R. § 416.946(c); SSR 96–8p, 61 Fed. Reg. at 34477. The ALJ recognized that Amason's mental impairments were severe, but not disabling. (Tr. 18.) While Amason may believe that his mental impairments require a more restrictive RFC finding than the ALJ assessed, this Court may not reweigh the evidence or substitute its judgment for the Commissioner's. *See Harris*, 209 F.3d at 417; *Hollis*, 837 F.2d at 1383. Accordingly, having carefully reviewed the record and the ALJ's discussion of the evidence, the Court concludes that the ALJ's RFC assessment is supported by credible evidentiary choices among the medical evidence in the record and demonstrates the existence of substantial evidence supporting the ALJ's decision. *See Boyd*, 239 F.3d at 704. Remand on Amason's first issue is not required.

**B.**     **Issue Two: Was the ALJ's Decision Flawed Because of an Incomplete Hypothetical Posed to the Vocational Expert, Inaccurate Vocational Expert Testimony, and a Failure to Address Erosion of the Occupational Base?**

In his second issue, Amason advances several complaints about the testimony of the vocational expert ("VE"). During the hearing, the ALJ posed a hypothetical question to the VE asking whether a person with Amason's age, education, work experience, and RFC would be able to perform any jobs. The VE answered that this hypothetical person could work as a conveyor line bakery worker, a counter clerk, and a tanning salon attendant. (Tr. 60.) The VE testified that these jobs would allow for alternating sitting and standing, but that this sit/stand option would reduce the number of positions available for each of these jobs. Specifically, the VE explained that, with alternating sitting and standing, the jobs would exist in the following numbers: (1) conveyor line bakery worker – 3,000 Texas jobs and 30,000 jobs in the national economy; (2) counter clerk – 1,200 Texas jobs and 15,000 jobs in the national economy; and (3) tanning salon attendant – 3,200 Texas jobs and 40,000 jobs in the national economy. (Tr. 60.) The VE testified on cross-examination that he had personally observed each of these jobs being performed "as a sit/stand job" within the past five years. (Tr. 61.)

Amason argues that the VE's testimony regarding the availability of the alternating sit/stand option for the identified jobs was erroneous because the description of these jobs in the Dictionary of Occupational Titles ("DOT") does not address a sit/stand option. (Pl.'s Br. 17–18.) The DOT cannot and does not purport to include each and every specific skill or qualification for a particular job. *Carey v. Apfel*, 230 F.3d 131, 145 (5th Cir. 2000). "The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986), *quoted in Carey*, 230 F.3d at 145. Thus, "the DOT job descriptions should not be given a role that is exclusive of more specific vocational expert testimony with respect to the

effect of an individual claimant's limitations on his or her ability to perform a particular job." *Carey*, 230 F.3d at 145.[6]

The Court sees no inherent conflict between the VE's testimony and the DOT's descriptions of the conveyor line bakery worker and counter clerk jobs.[7] The DOT does not provide that these jobs cannot be performed with alternating sitting and standing. Rather, the DOT is merely silent on the sit/stand option issue. The VE testified that he had personally seen these jobs being performed as sit/stand jobs within the past five years. Accordingly, the Court finds that this testimony properly provides insight beyond the DOT into the "specific requirements" and "working conditions" of the particular occupations identified by the VE that Amason could perform.[8] *See Fields*, 805 F.2d at 1170.

Amason further contends that the VE's testimony that the sit/stand option would reduce the number of positions available for each of these occupations is erroneous because he did not explain why some positions could be performed with the sit/stand option but other positions with the very same occupational title could not. (Pl.'s Br. 18.) Amason claims that the VE was wrong because "an occupation must either allow for a sit/stand option or it must not." (Pl's Br. 17.) Beyond this bare assertion, Amason does not cite any authority or point to any evidence showing that the VE's testimony regarding the reduction in number of jobs for each occupation due to the sit/stand option was incorrect or unreliable. Amason's counsel did not raise the issue

---

[6] *See also* SSR 00–4p, 65 Fed. Reg. 75759, 75760 (Dec. 4, 2000) ("The DOT lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings. A VE . . . may be able to provide more specific information about jobs or occupations than the DOT.")

[7] As noted below at pages 21–22, *infra*, Amason contends—and the Commissioner does not dispute—that the DOT does not contain the tanning salon attendant occupation identified by the VE.

[8] Further, Amason did not raise the issue of this claimed conflict between the DOT requirements and the VE's testimony at the hearing. "[C]laimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing." *Carey*, 230 F.3d at 146–47.

at the hearing or cross-examine the VE on this claimed defect in his testimony. Again, the value of the VE's testimony is that he has knowledge of the specifics of a particular occupation, and Amason provides no legally or factually supported reason for disregarding this testimony.

Finally, Amason argues that the ALJ did not properly consider the extent to which the limitations in Amason's RFC would erode the unskilled light occupational base. (Pl.'s Br. 18.) The term "occupational base" means the approximate number of occupations that an individual has the RFC to perform, considering all exertional and nonexertional limitations and restrictions. SSR 83–10, 1983 WL 31251, at *7 (eff. Feb. 26, 1979.) The functional capacity to perform a full range of light work includes the functional capacity to perform sedentary as well. *See* 20 CFR Pt. 404, Subpt. P, App. 2, § 202.00(a). Therefore, a full range of light work includes all or substantially all of the approximately 1,600 unskilled light and sedentary occupations administratively noticed in Table No. 2 of the regulations' Medical-Vocational Guidelines. *See id.*

When a claimant's RFC includes nonexertional limitations and, thus, does not exactly coincide with the definition of any one of the full ranges of work, the occupational base is affected and may or may not represent a significant number of jobs in terms of the rules directing a conclusion as to disability. *See* SSR 83–12, 1983 WL 31253, at *2 (eff. Feb. 26, 1979). In this situation, the ALJ considers the extent of any erosion of the occupational base and assesses its significance. *See id.* When the extent of erosion of the occupational base is not clear, the ALJ should consult a vocational resource, such as the VE. *See id.* "Whenever vocational resources are used, and an individual is found to be not disabled, the determination or decision will include (1) citations of examples of occupations/jobs the person can do functionally and vocationally and (2) a statement of the incidence of such work in the region in which the individual resides or in several regions of the country." *Id.* at *5.

The ALJ recognized that Amason's ability to perform the full range of light work was impeded by the additional limitations that the ALJ included in Amason's RFC. (Tr. 20.) Accordingly, the ALJ asked the VE at the hearing, "Would there be jobs for such a person [with Amason's RFC]?" (Tr. 60.) The VE testified that a person with Amason's RFC could perform work as a conveyor line bakery worker, counter clerk, and tanning salon attendant, but with a "reduced number of jobs available" that included a sit/stand option. (Tr. 60.) The VE also provided the specific number of jobs existing in Texas and in the national economy for each of the three identified occupations.[9] (Tr. 60.)

Amason argues that the ALJ's analysis of the erosion of the occupational base was insufficient because the ALJ should have also considered the effect of these limitations on sedentary work, since the exertional requirements of light work also encompass the exertional requirements of sedentary work. (Pl.'s Br. 18.) Amason complains that the ALJ's hypothetical was not limited to unskilled occupations, and the VE did not specify how many light, unskilled occupations remained that Amason was still able to do even with his additional limitations. (Pl.'s Br. 18, 20.) For the reasons that follow, the Court is unpersuaded by these arguments.

If the claimant proves at step four that he is unable to return to his past relevant work, the Commissioner has the burden at step five to prove that the claimant can engage in some other kind of substantial gainful work that exists in the national economy, i.e., work that exists in significant numbers either in the region where the claimant lives or in several regions of the country. *See* 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. §§ 416.920(f)–(g), 416.966(a); *Crowley*, 197 F.3d at 198. The regulations specifically state that "[w]ork exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which

---

[9] An "occupation" refers to a grouping of numerous individual "jobs" with similar duties. Within occupations (e.g., "carpenter") there may be variations among jobs performed for different employers (e.g., "rough carpenter"). SSR 96–9p, 61 Fed. Reg. 34478, 34480 n.4 (July 2, 1996).

[the claimant is] able to meet with [the claimant's] physical or mental abilities and vocational qualifications." 20 C.F.R. § 416.966(b).

Amason correctly observes that the VE did not testify as to how many occupations were "eroded" from the 1,600 unskilled light and sedentary occupations in light of Amason's additional limitations. Instead, the VE testified that a person with Amason's RFC, including the need to alternate standing and sitting, could still perform the specific occupations of conveyor line bakery worker, counter clerk, and tanning salon attendant, and the VE provided the total number of jobs for each occupation existing in Texas and in the national economy. The ALJ's decision contains all of this information provided by the VE. (Tr. 20.) Thus, the Court finds that the ALJ's step five finding satisfied the statutory and regulatory requirements requiring proof that Amason can engage in substantial gainful work that exists in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 416.966(b). The ALJ's decision also appropriately included examples of occupations/jobs that Amason could do and a statement of the incidence of such work in Amason's region or in several regions of the country. *See* SSR 83–12, 1983 WL 31253, at *5. Amason provides no legal authority for the proposition that the VE's testimony was insufficient for failing to specifically state the number of occupations eroded from the total unskilled light and sedentary occupations, and in light of the ALJ's compliance with the statutory and regulatory requirements, the Court declines to make such a finding.

However, Amason argues that the VE's failure to specifically state the number of "eroded" occupations is significant because most light jobs, particularly unskilled light jobs, require a person to be standing or walking most of the workday. (Pl's Br. 19.) *See* SSR 83–14, 1983 WL 31254, at *4 (eff. Feb. 26, 1979). Amason claims that because the VE had no guidance on how long Amason could sit in an eight-hour workday, or how long Amason could sit or stand before needing to change positions, the VE did not have sufficient information to

determine how many of the unskilled occupations remained that Amason would be able to perform. (Pl.'s Br. 20.) In support, Amason cites SSR 83–12, which states that a sit/stand option renders a claimant incapable of doing both the prolonged sitting required by sedentary work (and the few light-work jobs performed from a seated position) as well as the prolonged standing or walking required by most light work. (Pl.'s Br. 19.) SSR 83–12, 1983 WL 31253, at *4. Amason emphasizes SSR 83–12's statement that "[u]nskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will." *Id.*

However, SSR 83–12 goes on to state, "In cases of unusual limitation of ability to sit or stand, a [VE] should be consulted to clarify the implications for the occupational base." *Id.* That is precisely what the ALJ did here. The VE testified that the three identified jobs would allow for an alternating sit/stand option, but that the sit/stand option would reduce the number of positions available for each of these jobs. (Tr. 60.) The VE further testified that he had personally observed each of these jobs being performed as a sit/stand job within the past five years. (Tr. 61.) Accordingly, the Court does not find that a sit/stand option limitation, under these circumstances, is inconsistent with the performance of light work, particularly in light of the VE's specific testimony that these light-work jobs could be performed with a sit/stand option.

Amason complains that the tanning salon attendant occupation identified by the VE does not exist in the DOT.[10] The Commissioner does not contend otherwise, but instead argues that the remaining two jobs identified by the VE still provide evidence of a significant number of jobs available in the national economy. (Def.'s Br. 15.) There is no bright-line rule regarding what constitutes a significant number of jobs in the national economy. *Thompson v. Astrue*, No. 3-08-

---

[10] Amason also argues that the DOT's description of the conveyor line bakery worker job requires more than occasional handling, but the DOT classification for this job specifically states, "Handling: Occasionally - Exists up to 1/3 of the time." Employment and Training Administration, U.S. Dep't of Labor, 1 Dictionary of Occupational Titles 524.687-022 (4th ed., rev. 1991) [hereinafter DOT], *available at* 1991 WL 674401.

CV-1134-G, 2010 WL 2816677, at *7 (N.D. Tex. June 17, 2010), *adopted in* 2010 WL 2816680 (N.D. Tex. July 15, 2010). Rather, each case must be evaluated on its individual merits. *Id.* The ultimate question on judicial review is whether the ALJ's resolution of this fact issue is supported by substantial evidence. *Id.*

The VE testified that, for someone with Amason's RFC, there would be (1) 3,000 conveyor line bakery worker jobs in Texas and 30,000 jobs in the national economy and (2) 1,200 counter clerk jobs in Texas and 15,000 jobs in the national economy. (Tr. 60.) The VE further testified that both of these jobs were unskilled, with an SVP level of 2.[11] (Tr. 60.) The ALJ's decision reflects that he weighed the VE's testimony, as well as Amason's age, education, work experience, and RFC, in determining that there was a significant number of jobs in the national economy that Amason could perform. Under the circumstances of this case, the Court concludes that the ALJ's determination that Amason was capable of performing work that exists in significant numbers in the national economy was supported by substantial evidence. *See, e.g., Mercer v. Halter*, No. 4:00-CV-1257-BE, 2001 WL 257842, at *6 (N.D. Tex. Mar. 7, 2001) (concluding that 500 jobs in Texas and 5,000 jobs in the national economy constituted a significant number of jobs); *see also Gaspard v. Soc. Sec. Admin.*, 609 F. Supp. 2d 607, 619 (E.D. Tex. 2009) (stating that various appellate courts have found 500, 650–900, and 1400 jobs in a state to be sufficient to constitute a significant number of jobs). Remand is not required on Amason's second issue.

---

[11] *See* SSR 00-4p, 65 Fed. Reg. at 75760 (stating that unskilled work corresponds to an SVP of 1–2).

## C.     Issue Three: Did the ALJ Improperly Evaluate Amason's Obesity?

In his third issue, Amason argues that the Commissioner's disability determination must be remanded because the ALJ did not properly consider the effect of Amason's obesity in his assessment of Amason's RFC or social functioning, as well as in his analysis of Amason's combined physical and mental impairments. (Pl.'s Br. 21.)  SSR 02–1p concerns the evaluation of obesity and provides that "the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately."  SSR 02–1p, 67 Fed. Reg. 57859, 57860 (Sept. 12, 2002).  The ruling instructs adjudicators to consider the effects of obesity at all steps of the evaluation process, including the RFC determination.  *Id.*

Here, the ALJ cited SSR 02–1p in his step two discussion and found that Amason's obesity was a severe impairment.  (Tr. 13.)  The ALJ also found at step three that Amason's obesity, when considered with his remaining impairments, did not meet or medically equal any Listing.  (Tr. 13.)   In discussing Amason's RFC, the ALJ recognized that, in addition to Amason's degenerative disc disease and degenerative joint disease, Amason was also obese.  (Tr. 18.)   The ALJ stated that although Amason's obesity was severe, there was no evidence that it was disabling.  (Tr. 18.)   The ALJ did not specifically discuss the manner in which Amason's obesity factored into his determination that Amason did not have a Listing-level impairment or his assessment of Amason's RFC.

However, Amason does not direct the Court to any evidence showing that his obesity caused any functional limitations that were not accounted for in the RFC assessment or otherwise affected his abilities beyond the level acknowledged by the ALJ.  Amason fails to cite to any evidence in the record to demonstrate that his obesity exacerbated his other medical impairments, and he points to no medical record in which any physician stated that his obesity imposed additional limitations on his other medically diagnosed impairments.  Accordingly, Amason has

not met his burden to show that his obesity affected his physical and mental abilities to sustain work activity, and this issue is merely speculative. *See Vogt v. Astrue*, No. 3:11-CV-315-BH, 2011 WL 5245421, at *11 (N.D. Tex. Nov. 2, 2011) (citing *Leggett*, 67 F.3d at 564, and SSR 02–1p, 67 Fed. Reg. at 57862–63) (refusing to remand for further consideration of claimant's obesity when claimant did not identify any evidence of additional effects of her obesity on her ability to work). Therefore, remand on this issue is not required.

### D. Issue Four: Did the ALJ's Credibility Assessment Contain Errors of Law, and Was It Based on Substantial Evidence?

Finally, in his fourth issue, Amason challenges the ALJ's credibility finding. When medical evidence shows that a claimant has a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms, including pain, the ALJ then must evaluate the "intensity and persistence" of the claimant's symptoms to determine how the symptoms limit the claimant's capacity for work. 20 C.F.R. § 416.929(c)(1); *see also* SSR 96–7p, 61 Fed. Reg. 34483, 34484 (July 2, 1996). The ALJ must consider all of the available evidence, including (1) the claimant's history; (2) signs and laboratory findings; and (3) statements from the claimant, treating or nontreating sources, or other persons about how the symptoms affect the claimant. 20 C.F.R. § 416.929(c)(1). The ALJ may consider various factors relevant to a claimant's credibility, including (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication that the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, that the claimant receives or has received for relief of pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. *Id.*

§ 416.929(c)(3). "The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision." SSR 96–7p, 61 Fed. Reg. at 34486.

The ALJ found that Amason's statements regarding the intensity, persistence, and limiting effects of his symptoms were "not entirely credible." (Tr. 17.) First, the ALJ analyzed Amason's medication use and stated that (1) despite Amason's claim that he went to the doctor every week or every other week, the record revealed "relatively infrequent trips to the doctor"; (2) despite Amason's explanation that "it takes 2–3 weeks to see a doctor," Amason actually ran out of medication for his mental impairments because he missed three MHMR appointments in a row; (3) despite Amason's allegations of side effects, the medical records, such as office treatment notes, did not corroborate those allegations; and (4) the record revealed Amason's noncompliance with his prescribed medication regimen, "which suggests that [Amason's] symptoms may not be as limiting as he alleges." (Tr. 17.)

The ALJ discussed Amason's allegations of back pain but noted that physical examinations had been "relatively benign." (Tr. 17.) Amason testified that pain medication reduces his pain, and the ALJ observed that Amason "attends relatively infrequent appointments for his allegedly disabling pain and is currently treated only with pain medication." (Tr. 17.) The ALJ also observed that Amason said his doctor prescribed a back brace, but this prescription was not in the record. (Tr. 17.) Amason brought a cane to the hearing, but he did not testify that he required the cane for ambulation, and the record contained no prescription for a cane or documentation of observed usage of a cane. (Tr. 18.) The ALJ stated that Amason had testified that "several doctors told him he is disabled and their goal is to keep him active enough to bathe and dress himself," but the record contained no such opinion. (Tr. 19.) The ALJ also noted that, despite Amason's allegedly disabling pain, he was able to climb stairs to his third-floor apartment while carrying a sack of groceries. (Tr. 17.)

Finally, the ALJ observed that Amason had "an extremely poor work history and earnings record, which raises a question as to whether his continuing unemployment is actually due to medical impairments." (Tr. 18.) The ALJ elaborated as follows:

> [Amason] has a significant history of alcohol use, an eighth grade education, and an extensive criminal history, including check forgery, multiple DUIs, family violence, and an 11-month incarceration ending in 2009. On several occasions, [Amason] acknowledged that his criminal history and educational background make it difficult to find a job. A desire to avoid these barriers to finding and maintaining competitive employment could be a motivation for overstating the intensity, persistence, and limiting effects of symptomatology in order to obtain supplemental security income. [Amason's] testimony regarding his alcohol cessation and criminal history was quite vague, and left the impression that he may have been less than entirely candid.
>
> Although [Amason] has described significantly limited activities of daily living, it is difficult to attribute that degree of limitation to his medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision.

(Tr. 18–19.)

Amason argues that the ALJ did not properly evaluate the intensity, persistence, and limiting effects of his symptoms, but the ALJ's decision shows that the ALJ considered all of the available evidence, including Amason's history, medical signs and findings, and statements about his symptoms, as the ALJ was required to do. *See* 20 C.F.R. § 416.929(c)(1). "Credibility determinations by an ALJ are entitled to deference." *Alexander v. Comm'r of Soc. Sec. Admin.*, No. 3:07-CV-1749, 2008 WL 4791319, at *12 (N.D. Tex. Oct. 30, 2008) (citing *Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir. 1991)). "The ALJ is in the best position to assess a claimant's credibility since the ALJ 'enjoys the benefit of perceiving first-hand the claimant at the hearing.'" *Id.* (quoting *Falco v. Shalala*, 27 F.3d 160, 164 n.18 (5th Cir. 1994)). A claimant's statements about pain and other symptoms are not conclusive evidence of disability, but must be accompanied by medical signs and findings of a medical impairment that could

reasonably be expected to produce the pain or other symptoms alleged and that would lead to the conclusion that an individual is disabled. 42 U.S.C. § 423(d)(5)(A).

Amason challenges the ALJ's view that he attended "relatively infrequent" doctor's visits by pointing out that the record shows that his three consecutive missed MHMR appointments in late 2010 were due to conflicts with his appointments "for medical problems." (Tr. 544.) He also cites the transcript's records of his medical appointments, claiming that he averaged over three appointments per month during the year prior to the hearing. (Pl.'s Br. 23–24.) However, at the hearing, Amason explained that he would run out of medication because the doctors would give him a prescription that lasted twenty or thirty days but then would schedule the next appointment for ninety days later. Amason said he would call the doctor to get more medicine but that it would take two or three weeks to get an appointment. (Tr. 46.) Thus, if Amason was averaging three appointments per month as he claims on appeal, it is unclear why he also claimed that he ran out of his medication due to long stretches between doctor's visits.

Amason further points out that medication was not the sole treatment for his pain. He also received lumbar epidural injections, was given stretching instructions, and attended physical therapy. (Pl.'s Br. 24.) Amason contends that he has no control over the pace of his treatment, and he testified that doctors have told him that his back impairments are inoperable. (Tr. 44.) However, he also claimed that doctors have told him that he is disabled, but the ALJ found no such indication in the medical records. Amason also alleges that his medication causes undesirable side effects, but as the ALJ observed, the objective medical records contain little evidence to corroborate his allegations.[12]

---

[12] Amason cites to some MHMR records showing that he complained of side effects caused by medication for his mental impairments, such as restlessness and drowsiness. (Tr. 339, 344, 353, 490, 539.) Consultative mental health examiner Dr. Cole diagnosed him with adverse effects from medication, not otherwise specified. (Tr. 425.) Dr. Cole did not mention side effects, however, but stated that Amason would benefit from a re-evaluation of his prescribed medications to wean him off narcotics and to address his contentions that his bipolar medications were

The ALJ could appropriately consider any lack of consistency in Amason's statements in judging his credibility. *See* SSR 96–7p, 61 Fed. Reg. at 34486 ("One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record.") The ALJ noted that, despite Amason's complaints of pain, his physical examinations did not reflect limitations consistent with disabling pain. (Tr. 17.) Also, as stated above, Amason testified that medications helped to reduce his pain level, although they did not relieve the pain entirely. (Tr. 41, 43.)

It is the ALJ's duty to evaluate the credibility and relative persuasiveness of the testimony, and this Court may neither make credibility determinations nor reweigh the evidence. *See Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999). It is the role of the Commissioner, and not the Court, to resolve conflicts in the evidence. *Id.* Accordingly, after considering the entirety of the ALJ's decision, the Court determines that the ALJ properly considered all of the available evidence in evaluating the intensity and persistence of Amason's symptoms. The Court further determines that the ALJ adequately articulated his reasons for finding that Amason's testimony to the effect that he was incapable of performing any type of work activity was not credible. Remand on this issue is not required.

## RECOMMENDATION

It is recommended that the Commissioner's decision be affirmed.

### NOTICE OF RIGHT TO OBJECT TO PROPOSED FINDINGS, CONCLUSIONS, AND RECOMMENDATION AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate

---

not working. (Tr. 426.) Otherwise, the record contains only Amason's own subjective reports of side effects in forms submitted to the SSA. (Tr. 178, 185, 203, 215.)

Judge's proposed findings, conclusions, and recommendation within fourteen (14) days after the party has been served with a copy of this document. The United States District Judge need only make a de novo determination of those portions of the United States Magistrate Judge's proposed findings, conclusions, and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

### ORDER

Under 28 U.S.C. § 636, it is hereby **ORDERED** that each party is granted until March 15, 2013, to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions, and recommendation. It is further **ORDERED** that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further **ORDERED** that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions, and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED March 1, 2013.

JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE